# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

KRISTIN M. PRICE :
:
*Debtor,* :
: **Civil Action No.**
KRISTIN M. PRICE, : **2:17-cv-03064-EGS**
:
*Plaintiff/Appellee,* :
: **Bankruptcy No. 15-17645**
vs. :
:
BETSY DEVOS, SECRETARY UNITED :
STATES DEPARTMENT OF :
EDUCATION. :
:
*Defendant/Appellant.* :

## APPELLEE KRISTIN M. PRICE'S BRIEF IN OPPOSITION TO REVERSING THE BANKRUPTCY COURT'S JUDGMENT TO DISCHARGE HER FEDERAL STUDENT LOANS

WATERMAN & MAYER, LLP
Scott F. Waterman, Esquire
Attorney I.D. No. 73522
110 West Front Street
Media, PA 19063
(610) 566-6177
scottfwaterman@gmail.com

HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER
Matthew A. Hamermesh
Attorney I.D. No. 82313
One Logan Square, 27th Floor
Philadelphia, PA 19103
(215) 568-6200
mhamermesh@hangley.com

Dated: November 13, 2017

*Attorneys for Plaintiff/Appellee*

# TABLE OF CONTENTS

I.    Introduction.................................................................................1

II.   Statement of the Issues Presented and Standard of Review...........................3

III.  Statement of Case ........................................................................4

     A.    Kristin's Current Employment and Limited Options............................5

     B.    Kristin's Separation and Child-Care Needs .........................................7

     C.    Kristin's Current and Expected Income and Expenses........................8

IV.  Summary of Argument. ..................................................................11

V.   Argument ...................................................................................12

     A.    The Bankruptcy Court Correctly Held that the *Brunner* Test
          Only Requires Plaintiff to Show that Her Inability to Pay
          Would Last for the Current Term of the Loans ..................................12

          1.    The Bankruptcy Court Correctly Interpreted the *Brunner*
               Test When it Held that the Actual Loan Term – Not
               Some Extended Hypothetical 20-25 Year Income-
               Contingent Loan Repayment Term – Is the Measuring
               Period For the Second Prong of the *Brunner* Test....................14

          2.    The DOE Unreasonably Distorts the Meaning of
               Legislative History...............................................................17

          3.    Multiple Policy Reasons to Retain the *Brunner* Test ...............19

          4.    Courts Nationwide Have Rejected Applying Income-
               Contingent Repayment Plans to the Hardship
               Components of the *Brunner* Test.............................................21

     B.    There Was Sufficient Evidence to Support the Bankruptcy
          Court's Finding that the Financial Hardship Will Continue for a
          Substantial Portion of the Repayment Period of the Loans ................23

VI.  Conclusion ................................................................................27

# TABLE OF AUTHORITIES

**Cases**

*In re Al-Riyami*,
   No. 3:14-CV-73-WKW, 2014 WL 1584481 (M.D. Ala. Apr. 21,
   2014) ...............................................................................................................25

*In re Barrett*,
   487 F.3d 353 (6th Cir. 2007) ...........................................................................20

*In re Bene*,
   474 B.R. 56 (Bankr. W.D.N.Y. 2012) ..............................................................22

*In re Braun*,
   Bankr. No. 1.10-BK-11169-GM, 2012 WL 5199163 (Bankr. E.D.
   Va. Oct. 19, 2012) ............................................................................................22

*Brunner v. New York State Higher Education Services Corp.*,
   831 F.2d 395 (2d Cir. 1987) ......................................................................*passim*

*In re Crawley*,
   460 B.R. 421 (Bankr. E.D. Pa. 2011) ........................................................*passim*

*In re Derby*,
   199 B.R. 328 (Bankr. W.D. Pa. 1996) ..............................................................26

*Dorsey v. U.S. Department of Educ*ation,
   528 B.R. 137 (E.D. La. 2015) ...........................................................................20

*Edmonds v. Compagnie Generale Transatlantique*,
   443 U.S. 256 (1979) ..........................................................................................17

*Education Credit Management Corp. v. Polleys*,
   356 F.3d 1302 (10th Cir. 2004) ........................................................................16

*Education Credit Management Corp. v. Smith*,
   Civ. A. No. H-11-57, 2011 WL 4625397 (S.D. Tex. Sept. 30,
   2011) ...............................................................................................................25

*Education Credit Management Corp. v. Kelly*,
No. C11-1263RSL, 2012 WL 1378725 (W.D. Wash. Apr. 20, 2012),
*rev'd on other grounds sub nom,*
*Kelly v. Sallie Mae, Inc.,* 594 F. App'x 414 (9th Cir. 2015) ..............................22

*In re Erbschloe*,
Bankr. No. 11-72562, 2013 WL 1844712 (Bankr. W.D. Va. Jan.
16, 2013) ........................................................................................................16

*In re Faish*,
72 F.3d 298 (3d Cir. 1995) .........................................................................*passim*

*In re Gregory*,
387 B.R. 182(Bankr. N.D. Ohio 2008)................................................................21

*In re Harvey*,
Case No. 11-23142, 2013 WL 4478926 (Bankr. D. Colo. Aug. 20, 2013)........16

*Hedlund v. Educ. Res. Inst. Inc.*,
718 F.3d 848 (9th Cir. 2013) ................................................................................3

*Helmar Ins. Corp. v. Cox (In re Cox)*,
338 F.3d 1238 (11th Cir. 2003) .........................................................................12

*In re Johnson*,
Case No. 15-2631-JAR, 2016 WL 827752 (D. Kan. March 2,
2016) .................................................................................................................16

*Midlantic Nationall Bank v. New Jersey Department of Environmental*
*Protection*,
474 U.S. 494 (1986)...........................................................................................17

*In re Mosley*,
494 F.3d 1320 (11th Cir. 2007) ...........................................................................3

*In re Nightingale*,
529 B.R. 641 (Bankr. M.D. N.C. 2015)...............................................................21

*Price v. DeVos (In re Price)*,
573 B.R. 579 (Bankr. E.D. Pa. 2017) ..............................................................2, 18

*Queen v. Pennsylvania Higher Education Assistance Agency*,
210 B.R. 677 (E.D. Pa. 1997),
*aff'd without op. sub nom.*,
*In re Mayer,* 156 F.3d 1225 (3d Cir. 1998) ........................................................25

*In re Wolfe*,
501 B.R. 426 (Bankr. M.D. Fla. 2013) ..............................................................22

**Statutes and Rules**

11 U.S.C. § 523(a)(8).........................................................................................*passim*

Pub.L. No. 103-66, §455(d)(1), 107 Stat. 312, 348 (1993) ......................................16

**Other Authorities**

34 C.F.R. 682.200 ................................................................................................15

H.R. Conf. Rep. 105-750, 408, 1998 U.S.C.C.A.N. 404 (1998) .............................18

# I.    INTRODUCTION

The United States Department of Education ("DOE") in its brief seeks to radically – and improperly – increase the already heavy burden debtors face in seeking the statutorily authorized undue hardship discharge of educational debt under Section 523(a)(8) of the Bankruptcy Code, 11 U.S.C. § 523(a)(8). The DOE is asking this Court to modify the well-established *Brunner* Test – adopted in this Circuit in *In re Faish*, 72 F.3d 298, 306 (3d Cir. 1995) (adopting test from *Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395 (2d Cir. 1987)) – which requires a debtor to show, among other things, that their hardship situation is likely to persist "for a significant portion of the repayment period for student loans." *Faish*, 72 F.3d at 304-05 (quoting *Brunner*, 831 F.2d at 396).

First, the DOE wants this Court to modify the *Brunner* Test by pinning it to a much longer, hypothetical repayment period (20-30 years) based on loan modification programs the DOE offers, but debtors are under no obligation to accept. This longer period is not "the repayment period for student loans," and makes no sense as a matter of legislative history and policy. Second, the DOE argues that this Court should severely limit the sorts of evidence courts can accept to prove that hardship will persist for the requisite period of time, rather than applying ordinary principles of evidence and standard burdens of proof.

If this Court were to adopt these changes as the DOE suggests, it would essentially eliminate the under hardship discharge other than in a narrow class of cases. A debtor would have to show that either age or disability would prevent them from ever obtaining income sufficient to pay their loans. There is no basis in the legislative history, case law, or logic for such an extreme limitation. If Section 523(a)(8) were intended to be limited to debtors who are aged or disabled, it would have said so. It did not. The "undue hardship" exception should not be read so narrowly as the DOE suggests.

Chief Judge Frank of the Bankruptcy Court rejected both of the DOE's arguments in a detailed, 57-page opinion that thoroughly considered and dismissed every one of the DOE's arguments. *Price v. DeVos (In re Price)*, 573 B.R. 579 (Bankr. E.D. Pa. 2017). For the reasons discussed in Judge Frank's opinion and set forth below, this Court should affirm the Bankruptcy Court's decision.

## II.    STATEMENT OF THE ISSUES PRESENTED AND STANDARD OF REVIEW

A.    Did the Bankruptcy Court properly apply the second prong of the *Brunner* Test by holding that the time period to measure future undue hardship is the length of the actual student loan, rather than a speculative 25-year income contingent repayment plan? *Suggested Answer: Yes.*

B.    Was there credible evidence to support the Bankruptcy Court's factual findings that the Debtor's undue hardship will continue for a substantial portion of the repayment period of the student loans, where the Debtor has limited employment prospects, is recently separated from her spouse and supporting three young children, and taking additional employment will not increase her net income given child-care needs? *Suggested Answer: Yes.*

Application of the *Brunner* test involves mixed questions of fact and law. A bankruptcy court's findings as to each of the three prongs of the *Brunner* test are factual findings that should be reviewed by the district court for clear error, not *de novo*. *See, e.g., In re Mosley*, 494 F.3d 1320, 1326–27 (11th Cir. 2007) (holding that evidence at trial supported the bankruptcy court's findings that the debtor would be highly unlikely to become able to repay his student loans and had made good faith efforts to obtain work to enable him to repay those loans). By contrast, a bankruptcy court's interpretation of any pertinent legal questions, including whether or not a debtor is entitled to discharge based on the court's findings as to the three *Brunner* prongs, is a legal conclusion subject to *de novo* review. *See Hedlund v. Educ. Res. Inst. Inc.*, 718 F.3d 848, 849, 854 n. 10 (9th Cir. 2013) ("In a §523(a)(8) proceeding, the [bankruptcy court's] good faith finding" under the

third prong of the *Brunner* test "should be reviewed for clear error," but "we review the application of *Brunner de novo*, *i.e.*, whether the bankruptcy court properly applied the three-prong test" in deciding whether a debtor is entitled to discharge based on the *Brunner* findings).

## III.   STATEMENT OF CASE

Multiple factors led to Kristin Price's financial distress and journey into bankruptcy: unintentional and involuntary underemployment, marital separation, and her obligations as the primary custodian of her three young children.

Kristin is a 29-year old separated mother of three small children, ages 3, 5 and 11. (Joint Pretrial Statement, Statement of Uncontested Facts ¶¶1, 15 and 16 (hereinafter "JPS Facts").) Ms. Price graduated from Thomas Jefferson University with a Bachelor of Science in Radiologic Studies in 2011. (JPS Facts ¶¶2, 3.) She incurred $25,000 in governmental guaranteed student loan debt while attending school. (JPS Facts ¶3, Joint Exhibit 6, USA 00074, 00080.) The evidence at trial showed that she owed the Department of Education ("DOE") $25,971.85 on her governmental guaranteed student loans, with interest accruing at the rate of $4.72 a day. (JPS Facts ¶4.)

At the time Kristin stopped being able to make payments on her student loans in November, 2015, the DOE debt was scheduled to be paid off in November

2024. (JPS Facts ¶¶ 5, 6.) Her monthly payment obligation on the DOE loans was $235.95. (USA 00021.)

### A. Kristin's Current Employment and Limited Options

Kristin's degree qualified her to take the licensing board examinations for both vascular and general sonography. (TT 9:25 – 10:3.) She passed her licensing board examination for vascular sonography in 2013. (TT 10:13.) However, she did not pass her licensing examination for general sonography. (*Id*. 10:1-3.) She is not eligible to retake the general sonography boards unless she attends another twelve (12) month full-time program. (TT 10:8-10), J-4 p. 41.)

As a vascular sonography technician, Ms. Price performs ultrasounds on patients' veins and arteries, but not the heart. (TT. 9:12-13.) There are three other types of sonography, cardiac, perinatal and general sonography. (*Id*. 9:16-17.) Because of Ms. Price's limited licensing and qualifications, she cannot work in any area of sonography other than vascular sonography. (TT 9:18–10:10.)

Since obtaining her license, Ms. Price has been employed by Main Line Health as a vascular sonography technician. (JPS Facts ¶¶ 21, 22.) She is paid hourly at the rate of $34.22/hour, and works two full days from 7:30 a.m. to 4:00 p.m. and one half day per week, for a total of twenty hours per week. In addition, she is on-call 78 hours a month, but has only been called in for extra hours three

times since she began working for her current employer three years ago. (TT 28:14-20, JPS Facts ¶¶31, 32.) When she is on call she receives only $2.75 per hour to carry the beeper, which is included in the income discussed elsewhere. (K. Price Dep. at 49-50.)

Unlike other areas of sonography, there are more vascular sonographers in the market than available positions. As a result, and because of the limited nature of her license, the only positions available to Kristin are part time. (TT 40:_-9.) Kristin continues to look for additional work in her field but has not found any. (TT 11:15-12:1, 18:7-15, 20:17, 22:1-3.) Even the DOE acknowledges there are no full-time positions available in the Philadelphia metropolitan area where she can work longer hours. (JPS Facts ¶32.) With her current employer, a full-time position will likely not open up for another eight years. (TT 50:22-51:3.) At trial, Kristin explained, "It's a flooded field, and not something they tell you when you're in school; how hard it is to get a job." *Id.*

Kristin provided unrebutted and credible testimony that there is no likelihood that she will obtain additional work in her current field in the future either at her present job location or elsewhere. (TT 11:21-12:1, 22:3.)

She considered seeking additional employment in other fields, such as retail or food service, to supplement her income. But she determined that any additional

money she could make would not cover the additional childcare costs. (TT 13:5-8.) Full time day care would cost an additional $600 a month above what she is paying now (TT 15:1.)

### B.    Kristin's Separation and Child-Care Needs

The immediate cause of Kristin's financial difficulties leading to the bankruptcy filing was her separation from her estranged husband, Steven, in August, 2015. (JPS Facts ¶15; TT 11:8, 12:19-22.) As she testified, there is no chance for a reconciliation. (*Id.*)

Kristin is the sole custodian of her three children. (JPS Facts ¶16.) Due to the lack of his own suitable residence, her husband does not share day-to-day child-care responsibilities. (*Id.* 12: 11-22,27:13-14)

On Mondays and Wednesdays Kristin works from 7:30 a.m. to 4:00 p.m. and requires before and after-school care for the children. (JPS Facts ¶30.) Kristin's oldest child attends public school. (TT 30:11-12.) The middle child was in day care, but was to begin half-day kindergarten at the public school in September 2017. However, when that happens, Kristin's costs will not decrease because she will incur additional expenses for both before-school and after-school care. (TT 14:15-21.)

Kristin's youngest child is currently in day care, and will begin half-day

kindergarten in September, 2018. Her youngest child will also require before-

school and after-school care once she starts kindergarten, which Kristin will have

to pay for. (*Id*., 37:24.)

Currently, Kristin pays $1,127 a month in day-care expenses. (JPS Facts

¶25.) Even after all three children attend full-day public school in 2019, her child-

care costs likely will not substantially decrease. Kristin provided unrebutted

testimony that she will require before and after-school care for at least two of her

children who will be in first grade and third grade, which will cost $1,000.00 a

month (TT 39:11-25.) Kristin's child-care expenses will not decline for many

years.

### C.    Kristin's Current and Expected Income and Expenses

Kristin's gross monthly income is $3,455.82 and her take home pay is

$2,405.00 (JPS Facts ¶23.) In addition, she receives child support from her

husband in the amount of $1,400.00 per month, for a total of $4,312.00 to pay the

monthly living expenses for herself and her three children. (*Id.* ¶24.) She does not

expect any salary increases in the future for either her or her separated husband.

(JPS Facts ¶28; TT 11:21-24, 12:8-10.)

Kristin's monthly expenses exceed her income and total $4,482.00 as follows:

| | | |
|---|---:|---|
| | $1,400.00 | rent |
| | $230.00 | heat and electricity |
| | $30.00 | water |
| | $240.00 | cable, phone and internet |
| | $45.00 | cell phone |
| | $800.00 | food and household supplies |
| | $1,127.00 | child care and after school activities |
| | $150.00 | clothing |
| | $80.00 | personal care products |
| | $50.00 | out of pocket medical expenses |
| | $250.00 | gas and car maintenance |
| | $80.00 | entertainment |
| Total | $4,482.00 | |

(JPS Facts ¶25.)

Kristin lacks sufficient cash flow to pay all of her monthly expenses. She manages the shortfall by taking loans from her mother, which she repays from her income tax refund (TT. 15:10-15.) She does not own real estate or a car, and has no property other than the modest amount of exempt cash, cash equivalents and personal property listed in Schedule B of her bankruptcy schedules. (JPS Facts ¶¶17–19.)

Prior to filing bankruptcy, Kristin inquired with the Department of Education through its website to see if there were cheaper monthly payment

options and learned that her payments could not be lowered. (JPS Facts ¶29; TT 16:4-13; 10:23-33.)

At trial, the DOE's witness, Philippe Guillon, a Senior Loan Analyst for the Department of Education, could not specify what Ms. Price's loan payments would be in a hypothetical 20-25 year income contingency repayment plan or even if her monthly payments would be lower than what is required now. (TT 55: 15-16, 62:10-16.)

At trial the DOE conceded that Ms. Price has acted in good faith in attempting to repay her student loans and that good faith is not an issue in this case. (TT 7:13-17.) The DOE has not appealed the Bankruptcy Court's finding that Kristin has demonstrated that based on current income and living expenses, she could not maintain a minimal standard of living for herself and her three dependents if forced to repay the student loans, and that she has acted in good faith at all times. The only issue before this Court is whether Kristin's inability to make payments on her student loans and maintain a minimal standard of living will persist for a significant portion of the repayment period of her loans. As the bankruptcy court properly found, it will.

# IV. SUMMARY OF ARGUMENT.

This Court should affirm the bankruptcy court's judgment discharging Ms. Price's student loans and hold that repayment of her student loans would create an undue hardship under 11 U.S.C. §523(a)(8). The bankruptcy court correctly followed Third Circuit precedent and the *Brunner* Test holding that the period used to determine whether hardship exists is measured by the remaining length of the actual student loans, and not some hypothetical 25-year repayment plan. The Department of Education's suggestion that this Court should modify the *Brunner* Test to require debtors to show undue hardship not just for a substantial portion of the length of the actual loan, but rather for a generationally long period, has no basis in the statute or well-established case-law, and should be rejected.

In addition, there was substantial evidence at trial to support the bankruptcy court's factual findings that Kristin's financial situation is likely to persist for a significant portion of the repayment period of the student loans. The DOE's request that this Court undertake a *de novo* consideration of the evidence and engage in its own fact-finding is likewise contrary to the law. Moreover, this Court should reject the Department of Education's suggestion the bankruptcy court abandon its independent duty to make the hardship determination based upon the

unique facts of each case, and instead delegate those decisions to the Department, a

non-judicial governmental agency.

For these reasons, Ms. Price asks that this Court affirm the bankruptcy

court's order finding her eligible for discharge of her student debts based upon

undue hardship for her and her family.

## V.     ARGUMENT

### A.     The Bankruptcy Court Correctly Held that the *Brunner* Test Only Requires Plaintiff to Show that Her Inability to Pay Would Last for the Current Term of the Loans

An individual debtor like Kristin may not discharge her student loans

through bankruptcy unless she can show that repayment would cause her "undue

hardship." 11 U.S.C. § 523(a)(8). The term "undue hardship" is not defined in the

Bankruptcy Code. To guide courts' analysis, the Court of Appeals adopted the test

set out in *Brunner v. New York State Higher Education Services Corp.*, 831 F.2d

395 (2d Cir. 1987) (the "*Brunner Test*"), adopted in *In re Faish*, 72 F.3d 298, 306

(3d Cir. 1995). *See also Helmar Ins. Corp. v. Cox (In re Cox)*, 338 F.3d 1238,

1241–42 (11th Cir. 2003). Under the *Brunner* Test, a debtor is entitled to discharge

her student debts if she proves all of the following:

> 1)  that the debtor cannot maintain, based on current income and living expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans;

2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and

3) that the debtor has made good faith efforts to repay the loans.

*Brunner*, 831 F.2d at 396.

This three-prong test looks at three different time periods. The first prong focuses on the present ability of the debtor to repay the debt. The second prong looks to the future to determine how likely it is that the debtor could later *become* able to repay the loan. Finally, the third prong looks to the debtor's past conduct to determine whether her actions manifest a good faith effort to repay. The debtor bears the burden of proving each prong of the *Brunner* test by a preponderance of the evidence. *Faish,* 72 F.3d at 304-05.

Following a well-litigated trial, the bankruptcy court concluded that Kristin met her burden under all three prongs of the *Brunner* Test and is entitled to a discharge. The DOE's appeal focuses only on the second prong.[1] Contrary to the

---

1 On appeal, the DOE does not dispute that the bankruptcy court's findings that Ms. Price satisfies the first prong – she is currently experiencing financial hardship and cannot maintain, based on current income and living expenses, a minimal standard of living for herself and her dependents if forced to repay the loans – or the third prong – that she has acted in good faith of the *Brunner* Test.

DOE's argument, the bankruptcy court correctly interpreted and applied the second

prong of the *Brunner* Test.

1. **The Bankruptcy Court Correctly Interpreted the *Brunner* Test When it Held that the Actual Loan Term – Not Some Extended Hypothetical 20-25 Year Income-Contingent Loan Repayment Term – Is the Measuring Period For the Second Prong of the *Brunner* Test.**

The DOE's argument that the Bankruptcy court misread *Brunner* and its

progeny is meritless. The bankruptcy court correctly interpreted *Brunner* and *Faish*

in holding that the term "repayment period" must refer to the actual loan term and

not some potentially decades-long hypothetical repayment plan that leaves the

debtor indentured to the Department of Education.

Under the second prong of the *Brunner* test, the Debtor must demonstrate

that "additional circumstances exist indicating that [the debtor's present state of

economic distress] is likely to persist for a significant portion of the repayment

period" for [the] student loans and that this inability to pay is attributable to

reasons beyond the debtor's control. *In re Crawley,* 460 B.R. 421, 438 (Bankr.

E.D. Pa. 2011) (alteration in *Crawley*). The second prong actually is comprised of

two elements. *See* 4 Collier on Bankruptcy ¶ 523.14[2], at 523–105. The first is

whether the debtor's financial difficulties are "likely" to continue. *Id.* Under this

element, a debtor is only required to establish that her financial situation is not

likely to improve. *Id.* The second element is "temporal", requiring a debtor to prove that the duration of her financial hardship will be for a significant period of the repayment period. *Id.* at 523–105–06.

The plain meaning of the "repayment period of the student loan" is clear and easy to understand. It is the loan's term. First, the term "repayment period" was not created from whole cloth. In *Brunner*, the "repayment period" was for a finite period of amount of time and was easily understood by all parties (actually 10 years); easily measurable.

Secondly, the term "repayment period" is a defined term in the Master Promissory Note between Kristin and the Department of Education. Both parties understood that her "repayment period for each loan would last at least 5 years but may not exceed 10 years (except under an extended repayment plan) from the day the grace period ends." *See* Federal Stafford Loan Master Promissory Note, (USA 62, Item 12).

Thirdly, under 34 C.F.R. 682.200, the Department of Education defines "repayment period": The standard repayment period for student loans is 10 years, specifically *exclusive* of periods of deferment and forbearance. In this case, the parties stipulated that Ms. Price's student loans were scheduled to be paid off in November 2024. (JPS Facts ¶5.)

Several courts have concluded that the length of the "repayment period" must, and can only, be the remaining term of the actual loan. *See Educ. Credit Mgmt. Corp. v. Polleys*, 356 F.3d 1302, 1310 (10th Cir. 2004) (under second *Brunner* prong, "inquiry into future circumstances should be limited to the foreseeable future, at most over the term of the loan"); *In re Harvey*, Case No. 11-23142, 2013 WL 4478926 (Bankr. D. Colo. Aug. 20, 2013) (future circumstances should be limited to the foreseeable future, at most over the term of the loan); *In re Erbschloe*, Bankr. No. 11-72562, 2013 WL 1844712, at *6 n.8 (Bankr. W.D. Va. Jan. 16, 2013) (noting that maximum repayment period for debtor's non-consolidated loan is ten years). Significantly, some courts have held that, where the applicable repayment period expired, the future prong is inapplicable. *See, e.g., In re Johnson*, Case No. 15-2631-JAR, 2016 WL 827752, at *5 (D. Kan. March 2, 2016).

There is no reasonable basis to believe that the *Brunner* and *Faish* courts interpreted the "repayment period" to be greater than the actual loan term. Nothing other than the actual term existed and the decades-long income-contingent repayment plans offered by the Department of Education did not exist. The income-contingent repayment plans were authorized by Congress only in 1993. *See* Pub.L. No. 103-66, §455(d)(1), 107 Stat. 312, 348 (1993).

Moreover, although Congress has amended the provision of the Bankruptcy Code concerning discharge of student loans at least three times since it was enacated, it has never altered the three-prong *Brunner* Test for what constitutes undue hardship. Congress is presumed to legislate with knowledge of existing common law. When it amends a statute, related judge-made law (common law) is presumed to remain in force and work in conjunction with the new statute absent a clear indication otherwise. "The normal rule of statutory construction is that if Congress intends for legislation to change the interpretation of a judicially created concept, it makes that intent specific." *Midlantic Nat'l Bank v. New Jersey Dep't of Envtl Protection*, 474 U.S. 494, 501 (1986) (quoting *Edmonds v. Compagnie Generale Transatlantique*, 443 U.S. 256, 266-67 (1979)). There is no reason for this Court to change the well-established interpretation of the second prong of the *Brunner* Test, which the Bankruptcy Court interpreted correctly.

### 2. The DOE Unreasonably Distorts the Meaning of Legislative History

The DOE asserts, however, that the 1998 amendment that repealed Section 523(a)(8)'s seven (7) year discharge provision "makes clear that Congress intended *undue hardship determinations to be measured in light of*" other options available to borrowers, including extended, income-contingent and income sensitive

repayment options. (DOE Brief at 14 (emphasis added).) As the Bankruptcy Court

noted in its Opinion, however, the legislative history cited actually states:

> The conferees, in the effort to ensure the budget
> neutrality of this bill, adopted a provision eliminating the
> current bankruptcy discharge for student borrowers after
> they have been in repayment for seven years. The
> conferees note that this change does not affect the current
> provisions allowing any student borrower to discharge a
> student loan during bankruptcy if they can prove undue
> economic hardship. *The conferees also note the
> availability of various options to increase the
> affordability of student loan debt, including deferment,
> forbearance, cancellation and extended, graduated,
> income-contingent and income-sensitive repayment
> options.*

*Price v. Devos (In re Price)*, 573 B.R. 579 (Bankr. E.D. Pa. 2017) (citing H.R.

Conf. Rep. 105-750, 408, 1998 U.S.C.C.A.N. 404, 441 (1998)) (emphasis in

original).

In explaining the elimination of a debtor-protective provision from the

Bankruptcy Code, the Conference Report specifically states that the undue

hardship provision of the Bankruptcy Code was unaffected. It merely "not[ed]" the

existence of other programs. In context, that reference suggests that the other

programs may ameliorate the potential negative effect of the legislative

amendment. But nothing in this passage "makes clear" that Congress intended to

"measure" §523(a)(8) undue hardship itself in light of these other programs. As the

Bankruptcy Court recognized, the DOE unreasonably distorts the meaning of the legislative history.

### 3.    Multiple Policy Reasons to Retain the *Brunner* Test

Nor does the DOE's argument undermine any of the numerous common-sense policy reasons the Bankruptcy Court offered to show why the repayment period for purposes of the second prong of the *Brunner* Test should remain the actual contract term, rather than potential and uncertain 20-25 year repayment plans.

To effectuate Section 523(a)(8)'s balance between ensuring a fresh start and its goal of protecting the fiscal integrity of governmentally guaranteed student loan programs, the borrower's loan term should be one that has a realistic possibility of being paid off. Many borrowers, even if they participate in an extended term income contingent repayment program, may pay little or nothing over the term of the loan, with the balance being discharged at the end of the extended term. The minuscule effect on government finance that results in not discharging unpayable loans is trumped by the general bankruptcy policy of providing a debtor with a fresh start.

Likewise, requiring judges to engage in gross speculation to determine whether to grant a discharge of education loans is inappropriate. Judges may be

wise, but they are not soothsayers. Asking a court to predict a debtor's financial circumstance in 20 to 25 years into the future can be nothing more than guesswork without any reasonable degree of certainty. Analysis of a debtor's future financial situation must be based upon estimation of the debtor's prospects grounded in specific facts, not unfounded optimism. Removing evidence-based, realistic analysis from the test raises a legitimate concern about the integrity of the judicial decision making and the public's perception of the process.[2] In this case, even DOE's witness could not opine as to the amount of Kristin's payment under a hypothetical 20-25 year repayment plan. More importantly, he had nothing to say about whether she would in fact be able to make those payments.

Nor does any desire to ensure a debtor's good faith require use of the DOE's proposed much longer period. Whether a debtor has attempted to refinance her student loan is already a factor in the good-faith analysis under the third prong of the *Brunner* Test. Courts have held that a debtor's refusal to enter into an income-based plan bears on the good-faith analysis. *See In re Barrett*, 487 F.3d 353, 364-365 (6th Cir. 2007); *Dorsey v. U.S. Dep't of Educ.*, 528 B.R. 137, 144 (E.D. La.

---

2    "Prediction is very difficult, especially if it's about the future."Nils Bohr, Nobel laureate in Physics.

2015); *In re Gregory*, 387 B.R. 182, 187(Bankr. N.D. Ohio 2008) (debtor's knowing refusal to investigate income based plans shows bad faith); *Crawley*, 460 B.R. at 445-46 (failure to enter income based plan is one factor of several factors in good faith analysis). Again, in this case, the DOE has conceded that Ms. Price satisfied the third-prong of the *Brunner* Test by acting in good faith. This Court should reject the DOE's attempt to evade that concession by improperly importing an element of good faith into the second prong.

### 4. Courts Nationwide Have Rejected Applying Income-Contingent Repayment  Plans to the Hardship Components of the *Brunner* Test

Courts across the country have rejected the DOE's argument applying the income contingent repayment option to the *Brunner* hardship analysis. The DOE does not cite any courts that have adopted its extreme misinterpretation of the second prong of the *Brunner* Test. Indeed, many courts have recognized that actual, not hypothetical, payment plans are the touchstone under *Brunner.* For example, in *In re Nightingale*, 529 B.R. 641, 650 (Bankr. M.D. N.C. 2015), the bankruptcy court rejected the lender's argument that a "repayment" program with a longer period, under which the debtor conceivably would not pay anything, constituted a repayment program that should be part of the analysis under the test. *Id.* The court refused to jump the logical chasm necessary to conclude that "no

payment" constitutes "repayment", regardless of the title that the lenders choose to give to a program that excuses the debtor from repaying her loans. Likewise, in *In re Wolfe*, 501 B.R. 426, 436 (Bankr. M.D. Fla. 2013), the court rejected the lender's contention that a zero-dollar monthly payment under income-contingent plan should be used to evaluate the first prong. *Id.* ("where the debtor is living just above the poverty level and has no excess income, a contingent-income program would likely do him more harm than good"); *see also In re Braun*, Bankr. No. 1.10-BK-11169-GM, 2012 WL 5199163, at *6 (Bankr. E.D. Va. Oct. 19, 2012) (first *Brunner* prong looks at whether the debtor "can maintain a minimal standard of living if he were required to make monthly payments on his student loans, not if he is not required to repay his loans"); *In re Bene*, 474 B.R. 56 (Bankr. W.D.N.Y. 2012); *Education Credit Mgmt. Corp. v. Kelly*, No. C11-1263RSL, 2012 WL 1378725, at *2 (W.D. Wash. Apr. 20, 2012) (declining to evaluate *Brunner* first prong based on hypothetical facts assuming debtor participated in Public Service Loan Forgiveness Program), *rev'd on other grounds sub nom, Kelly v. Sallie Mae, Inc.,* 594 F. App'x 414 (9th Cir. 2015) (reinstating bankruptcy court partial discharge order).

Finally, as the court stated in *Crawley*, *supra,* at 438, an Income Contingent Repayment Plan has no relevance to first *Brunner* prong. If it did, the court would

be delegating hardship determinations under § 523(a)(8) to an administrative agency, i.e., the Department of Education, depriving the bankruptcy court of its singular and proper role intended by Congress—making dischargeability determinations.

In *Brunner,* the Second Circuit was not directing trial courts to make predictions about a debtor's state of financial affairs twenty or more years into the future. That court was concerned with debtors like Ms. Brunner, who sought a discharge within months of when her loans became due instead of waiting five years to seek the discharge when it would be automatic.

This Court should reject the Government's suggestion to apply a protracted income contingent payment plan for the second *Brunner* prong for the same reason courts have rejected such a plan for the first prong. Doing so would be delegating hardship determinations under § 523(a)(8) to an administrative agency, depriving the bankruptcy court of its unique role in dischargeability determinations. *See Crawley, supra*, at 438.

### B. There Was Sufficient Evidence to Support the Bankruptcy Court's Finding that the Financial Hardship Will Continue for a Substantial Portion of the Repayment Period of the Loans

Ms. Price's student loans are scheduled to be paid off in November 2024 (JPS Facts ¶5). Ms. Price had approximately eight years remaining on those loans

when she filed for bankruptcy. At trial, there was more than enough additional evidence for the court to conclude that Kristin's hardship will continue for a substantial portion of that time. That evidence includes:

1. Since Kristin graduated, the only positions available are on a part-time basis. (TT 40:1-9.)

2. Kristin has looked for additional work in her field and has found none. (TT 11:21-1, 18:7-15, 20:17, 22:1-3)

3. There are no full-time positions in the Philadelphia metropolitan area where Kristin can work longer hours. (JPS Facts ¶32.)

4. Where she works now, the next full-time position will not open up for another eight years. (TT 50:22-51:3.)

5. Kristin provided unrebutted testimony that there is no likelihood that she will obtain additional work in the future either at her job or elsewhere. (TT 11:2112:1; 22:3.)

Ms. Price also testified that her alternative work options are limited. She cannot practice any other form of sonography (other than vascular) because she is not licensed to do so. Likewise, the training and expertise she has in her sub-specialty is not really transferable to other fields. (TT 9:20.) The only realistic **likely** alternative for her would be to work in retail earning minimum wage.

But those earnings would be almost entirely set off by the additional cost of day care such work would require. (TT 49-51.) The evidence was more than sufficient for the bankruptcy court to conclude that Kristin's expenses will remain

constant. One example is the cost of day care. Even after all three children attend full day public school in 2019, Kristin's child-care costs will not decrease substantially. Kristin provided un-rebutted testimony that, even if she were to find additional work in retail, she would require before and after-school care for at least two of her children, who will be in first grade and third grade, which will cost $1,000.00 a month. (TT 39:11-25.) That additional cost will entirely consume any additional income she could earn through such work.

Indeed, many courts have recognized that high child-care costs are relevant to, and enough to satisfy, the second prong of the *Brunner* test. *See In re Al-Riyami*, No. 3:14-CV-73-WKW, 2014 WL 1584481 (M.D. Ala. Apr. 21, 2014) (second prong satisfied when debtor is single mother with two children ages 4 and 8 and is unlikely to earn increased income in foreseeable future); *Educ. Credit Mgmt. Corp. v. Smith*, Civ. A. No. H-11-57, 2011 WL 4625397 (S.D. Tex. Sept. 30, 2011) *(Brunner* second prong satisfied by 56-year-old debtor working in medical clerical position with no prospects for earning higher income and with no evidence that debtor had foregone more lucrative employment opportunities); *Queen v. Pennsylvania Higher Educ. Assistance Agency,* 210 B.R. 677 (E.D. Pa. 1997), *aff'd without op. sub nom. In re Mayer,* 156 F.3d 1225 (Table) (3d Cir. 1998) (discharge granted to single-parent manual laborer with uncompleted

Master's degree; any salary increase from full-time work would be offset by day-care costs); *In re Derby,* 199 B.R. 328 (Bankr. W.D. Pa. 1996) (need to care for young children). Contrary to the DOE's argument, the fact that Kristin's income would not increase if she took on additional low-paying work – because any additional income would be set-off by increased child-care costs – is supported by the trial evidence, case law, and logic.

The DOE's only other argument concerning the trial record is a flat denial that Ms. Price proved "additional circumstances" indicating her ongoing inability to pay the loans and maintain a minimal standard of living during a substantial portion of the actual repayment period. The DOE's position ignores numerous facts in the record showing additional circumstances – beyond her current reduced income, separation from her spouse, and substantial child-care obligations – that demonstrate her current state of affairs will persist. These include, among other things, the facts that: she would have to undertake a year of additional full-time, training –during which she could not work – to gain another license that would enable to her to obtain full-time work in the short term as a sonographer; her child-care costs won't change in the future; and there is no prospect of full-time employment at her current job. These facts are more than sufficient to establish the necessary "additional circumstances."

The DOE does not otherwise argue that any of Kristin's expenses are unreasonable or that the she would not be required to incur these expenses in the years ahead. Accordingly, the trial record fully supports the bankruptcy court's finding that Ms. Price satisfied the *Brunner* Test.

## VI.  CONCLUSION

The trial record contains clear, substantial and credible evidence supporting the bankruptcy court's findings that Ms. Price cannot maintain a "minimal" standard of living for herself and her family if forced to repay the loans, based upon her current income and expenses. Moreover, the Court found that this state of affairs is likely to persist for a significant portion of the repayment period for her actual student loans.

The bankruptcy court also correctly interpreted the *Brunner* Test as looking to the actual repayment period of the loans to determine the relevant period during which that state of affairs is likely to persist.

Because the record supports the bankruptcy court's findings and its legal conclusions were plainly correct, this Court, in turn, should reject the Department of Education's suggestion to modify the *Brunner* standard, impose lengthy debt repayment obligations that are not otherwise required, and delegate to the DOE the

case-by-case dischargeability decisions properly belonging to the bankruptcy courts, and affirm the bankruptcy court's decision.

Respectfully submitted,

HANGLEY ARONCHICK SEGAL
PUDLIN & SCHILLER

Dated: November 13, 2017     By:    */s/ Matthew A. Hamermesh*
           Matthew A. Hamermesh
           Attorney I.D. No. 82313
           One Logan Square, 27th Floor
           Philadelphia, PA 19103
           (215) 568-6200
           mhamermesh@hangley.com

WATERMAN & MAYER, LLP

Dated: November 13, 2017     By*:*    */s/ Scott F. Waterman*
           Scott F. Waterman
           Attorney I.D. No. 73522
           110 West Front Street
           Media, PA 19063
           (610) 566-6177
           scottfwaterman@gmail.com

*Attorneys for Plaintiff/Appellee*

**CERTIFICATE OF SERVICE**

I, Matthew A. Hamermesh, hereby certify that on this day, November 13,

2017, a true and correct copy of the foregoing Appellee, Kristin M. Price's Brief in

Opposition to Reversing the Bankruptcy Court's Judgment to Discharge her

Federal Student Loans were served upon all parties of record by ECF and upon the

parties listed below by U.S. mail:

Anthony St. Joseph, Esquire
United States Attorney Office
6l5 Chestnut Street, Suite 1250
Philadelphia, PA 19106
Anthony.StJoseph@usdoj.gov
*Counsel for Defendant/Appellant*

Gary F. Seitz, Esquire
Gellert Scali Busenkell & Brown LLC
The Curtis Center
601 Walnut Street, Suite 750 West
Philadelphia, PA 19106
gseitz@gsbblaw.com
*Chapter 7 Trustee*

United States Trustee
Office of the U.S. Trustee
833 Chestnut Street, Suite 500
Philadelphia, PA 19107
USTPRegion03.PH.ECF@usdoj.gov
*U.S. Trustee*

_/s/ Matthew A. Hamermesh___
Matthew A. Hamermesh